IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| ANDREW ASHER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 11-3166-CV-S-ODS ) |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) ) ) |
| Defendant. | ) |

**ORDER AND OPINION AFFIRMING FINAL DECISION**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his disability application. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff is a 44-year-old male smoker with past relevant work as a document preparer. The ALJ found Plaintiff suffered from the following severe impairments: depression, anxiety, fibromyalgia, chronic fatigue, cervical degenerative disc disease, headaches, lumbar degenerative disc disease, and coronary artery disease. The ALJ determined Plaintiff was not disabled after finding he retained the residual functional capacity (RFC) to perform his past work as a document preparer.

II. DISCUSSION

The Court must affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). Substantial evidence is relevant evidence a reasonable mind would accept as adequate to support a conclusion. *Id.* Evidence that both supports and detracts from the ALJ's decision must be considered. *Id.* If two inconsistent positions can be drawn from the

evidence, and one of those positions represents the ALJ's decision, it will be affirmed. *Id.*

Plaintiff first argues the ALJ erred in failing to evaluate whether he met Listing 12.07 in 20 C.F.R. § 404, Subpart P, App. 1: "Somatoform disorders: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." Deborah A. Webster, PhD, of St. John's Pain Management Center, conducted a "Behavioral Medicine Evaluation" of Plaintiff on July 10, 2007. She diagnosed Plaintiff with, among other things, "[p]ain disorder associated with both psychological factors and a general medical condition." A state agency psychological consultant later categorized this as somatoform disorder, which requires the following to meet Listing 12.07, in addition to other criteria:

> A. Medically documented by evidence of one of the following:
>
> 1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
>
> 2. Persistent nonorganic disturbance of one of the following:
>
> a. Vision; or
>
> b. Speech; or
>
> c. Hearing; or
>
> d. Use of a limb; or
>
> e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
>
> f. Sensation (e.g., diminished or heightened).
>
> 3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury.

20 C.F.R. § 404, Subpart P, App. 1. Plaintiff's somatoform disorder satisfies neither 1, 2, or 3 of this Listing: there is no evidence of multiple physical symptoms beginning

2

before age 30[1]; none of the disturbances in 2 are established; and there is no evidence Plaintiff had a preoccupation or belief he had a serious disease or injury. The ALJ's failure to discuss Listing 12.07 was harmless because Plaintiff did not meet it.

Plaintiff next contends the ALJ failed to properly weigh the medical opinions in the record. The ALJ discussed the opinions of the state agency medical and psychological consultants, but he failed to explain the weight he assigned these opinions. This was error. *See* 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii) ("[T]he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant.")

However, Plaintiff has not shown how this error harmed him. Both of the opinions were consistent with the ALJ's conclusion Plaintiff was not disabled.[2] Plaintiff focuses on the opinion of Van Kinsey, DO, the state agency medical consultant. Plaintiff notes Dr. Kinsey "included several postural limitations, including a limit to frequent bending, stooping, crouching, and crawling." Plaintiff associates these limitations with his treating physicians' findings that he experienced "tightness across his low back, as well as positive reactions in several tenderpoints, resulting in painful movement." But even if Dr. Kinsey's postural limitations were included in the RFC, this would not have changed the ALJ's determination that Plaintiff could return to his past work as a document preparer. Plaintiff makes no argument that this occupation required more than "frequent bending, stooping, crouching, and crawling," and the Dictionary of Occupational Titles does not state these activities are required at all. *See*

---

[1] Plaintiff asserts that he "reported that his symptoms have been present for more than ten years," but the page in the record Plaintiff cites to substantiate this fact establishes only that he "reported that he has headaches for about five to ten years." [Tr., 571]

[2] The psychological consultant concluded it was "possible that [Plaintiff's] confluence of symptoms would result in difficulty completing a full work week at AOD [alleged onset date] but it does not appear likely the conditions would persist if the claimant follows the recommended treatment." The medical consultant concluded Plaintiff was able to perform work with certain restrictions, many of which were included in the ALJ's RFC determination.

DICOT 249.587-018. As a result, the ALJ's failure to include Dr. Kinsey's limitations in his RFC determination was harmless.

Plaintiff also argues the ALJ should have ordered a consultative examination. 20 C.F.R. §§ 404.1519a(b) and 416.919a(b), both titled "[s]ituations requiring a consultative examination," state, "A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim." Since the only two medical opinions regarding Plaintiff's ability to function in the workplace came from nonexamining sources, Plaintiff argues a consultative examination was required. But the case he cites in support of this argument, *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), has been limited in application to step 5 of the sequential analysis. *See Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (discussing *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)). Because the ALJ ended the sequential analysis at step 4 by concluding Plaintiff could return to his past work, *Nevland* does not apply, and a consultative examination was not necessary.

Plaintiff further contends the ALJ's "restriction on high stress work" is too vage to satisfy *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003), which notes an ALJ "is required to set forth specifically a claimant's limitations and to determine how those limitations affect her RFC" (citation omitted)). But the ALJ's finding was not conclusory, as Plaintiff depicts it to be; the ALJ found Plaintiff "is not able to cope with high stress work *involving fast paced activity, production quotas, deadlines and schedules or changing work settings*" (emphasis added). With these characteristics describing high stress work, the ALJ's limitation was sufficiently specific. *Cf. Martise v. Astrue*, 641 F.3d 909, 919, 927 (8th Cir. 2011) (upholding ALJ's hypothetical question to vocational expert which included limitation of "work in a low-stress environment without public contact").

Lastly, Plaintiff attacks the ALJ's credibility finding. The ALJ found Plaintiff not credible in part because Plaintiff was living with his fiancée's father and he had tested positive for cannabis during a medical visit, both of which the ALJ thought demonstrated Plaintiff lacked motivation to work. But the medical records do not establish Plaintiff's cannabis use to be consistent or frequent during the relevant period, and the Court does

4

not find lack of motivation to be a reasonable inference merely from Plaintiff's living arrangement.

The ALJ's primary reason for discounting Plaintiff's credibility was that "[Plaintiff's] allegations regarding his impairments appear to be exaggerated when compare to the objective medical evidence of record." Plaintiff does not dispute that the clinical findings in the record offer very little support for his allegations of severe pain.[3] Rather, he counters "[t]he ALJ failed to properly consider that [his] reports of pain were as a result of a severe somatoform disorder." He cites *Easter v. Bowen*, 867 F.2d 1128, 1131 (8th Cir. 1989).

In *Easter*, the claimant suffered from "somatoform or conversion disorder," which "cause[d] her to believe that her physical ailments [were] more serious than the clinical data would suggest." *Id.* at 1129. Like the ALJ in this case, the ALJ in *Easter* denied benefits due to the lack of objective evidence supporting the claimant's physical complaints. The district court upheld that decision, but the Eighth Circuit reversed, holding that the ALJ "focuse[d] unduly on the objective physical data." *Id.* at 1131. The court reasoned that "[a]ny shortcomings in the objective medical data that support[ed] her alleged physical ailments [were] irrelevant since her primary disorder, as clinically diagnosed, cause[d] her to exaggerate her physical problems in her mind beyond what the medical data indicate." *Id.* at 1130. Thus, "the ALJ [was] not free to reject her subjective experiences [due to the lack of objective medical evidence], particularly since she has a diagnosed mental disorder that causes a distorted perception of her physical ailments." *Id.* at 1131.

However, there is a key distinction between *Easter* and Plaintiff's case. In *Easter*, the claimant had not yet had an opportunity to pursue the treatment recommended by a psychological consultant, which included "'intensive psychotherapy'" and ""treatment for the chronic pain disorder (Psychological Factors Affecting Physical

---

[3] For example, the Commissioner notes that a magnetic resonance imaging (MRI) scan of Plaintiff's cervical spine showed only "very mild degenerative changes," while an MRI scan of Plaintiff's brain taken September 2007 in connection with his headache complaints was normal.

5

Conditions) which would require the services of a multidisciplinary high quality pain clinic.'" 867 F.2d at 1129. But Plaintiff *did* had opportunities to pursue intensive, specialized treatment, which he failed to fully pursue. On May 30, 2007, Plaintiff was evaluated by Benjamin A. Lampert, MD, at St. John's Pain Management Center. Dr. Lampert's impression was that "fibromaylgia [was] [Plainitff's] overall pain generator, along with his anxiety and depression." Dr. Lampert recommended "conservative treatment" and that Plaintiff "get an evaluation in our chronic pain program for possible advanced treatment." As part of this recommendation, or in addition to it, Dr. Lampert referred Plaintiff to Dr. Webster (who conducted a behavior evaluation and diagnosed Plaintiff with "[p]ain disorder associated with both psychological factors and a general medical condition"). Dr. Webster recommended that Plaintiff "participat[e] in the Intensive Chronic Pain Day Treatment Program," as well as obtain a psychiatric consultation and participate in outpatient psychotherapy. There is no indication Plaintiff pursued these latter two recommendations.

As for the intensive pain program, Plaintiff was scheduled to attend twice per week for 6 weeks, but he attended only one session and then canceled and "no showed" the next three sessions. A medical note dated September 4, 2007, documents Plaintiff was contacted regarding his absence, and he stated would not be returning at that time because he was following up with his neurologist regarding an abnormal CT scan. Plaintiff was advised that he could return to the program once these other issues were resolved; however, Plaintiff did not return even after his neurologist reported (in October 2007) that an MRI scan of his brain was "normal" and that the "abnormal CT is artifact."[4,5] Notably, during an office visit at St. John's Pain Management Center on April

---

[4] "[A]rtifact" in this context means "[a]nything, especially in a histologic specimen or a graphic record, which is caused by the technique used and does not reflect the original specimen or experiment." *Stedman's Medical Dictionary*, p. 163 (28th ed. 2006).

[5] The Court notes that on January 12, 2009, Plaintiff's physician, Malcolm B. Oliver, MD, reviewed a more recent MRI scan and concluded Plaintiff "ha[d] a small lacunar infarct in the right fronto-parietal region and small vessel disease." "A lacunar infarct is a tiny stroke that often causes no neurologic symptoms (these are also

6

14, 2008, Plaintiff stated that he was unable to follow through with the intensive program due to "employment issues," not because of a CT scan. Since Plaintiff was no longer employed at that time, his examiner noted she would attempt to determine if he could return to the multidisciplinary group, but nothing documents what she found. More significantly, nothing establishes Plaintiff made any effort to return to the group. In addition, Plaintiff was referred to St. John's Headache Clinic in April 2009, but there is no indication he ever attempted to follow through with that recommendation.

This is not to say Plaintiff did not pursue *some* treatment from pain specialists. As noted, he was treated at the St. John's Pain Management Center. He also received treatment at the CoxHealth Pain Clinic. In addition, Plaintiff correctly points out that his reports of pain and how it affected his daily activities were consistent throughout the relevant period, and the Court further notes Plaintiff frequently sought medical treatment. But he did not pursue the specialized treatment noted above, and this weighs against his allegations. *See* SSR 96-7P ("[T]he individual's statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.")[6]

Also, the ALJ noted Plaintiff appeared to be doctor shopping, and the record supports this finding. For example, on March 13, 2009, Dr. Oliver refilled Plaintiff's Vicodin, with instructions that the prescription should last 25 days. Two refills were included in Dr. Oliver's order. On May 8, 2009, Plaintiff was seen at the CoxHealth Emergency Room, complaining of neck pain (for which he was being treated by Dr. Oliver, as well as his headaches). He received Ultram. The very next day he went to *St. John's* Emergency Room, again complaining of neck pain. He told the nurse

---

referred to as 'silent' strokes)." Jake L. Kaufman, BA & Steven Karceski, MD, *Risk factors and prevention of lacunar infarcts in 60- to 64-year-olds*, NEUROLOGY (Jan. 31, 2012, 9:30 AM), http://www.neurology.org/content/73/4/e17.

[6] SSR 96-7P requires the ALJ to "consider[ ] any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." In this case, Plaintiff's alleged reasons for not seeking treatment are provided in the record, and they were inconsistent.

7

practitioner he had *no pain medicine*; nothing was mentioned regarding Dr. Oliver or CoxHealth.  He was offered Ultram and a pain shot, but refused these options.  When told he would not be prescribed narcotics, he left.  He visited Dr. Lampert (of St. John's) two days later and received Vicodin; again, nothing was mentioned regarding Dr. Oliver or CoxHealth.  Plaintiff returned to Dr. Oliver on June 1, 2009, who refilled Plaintiff's Vicodin prescription (among others).  Nothing suggests Dr. Oliver knew of Plaintiff's emergency room visits or Dr. Lampert.  Plaintiff's apparent doctor shopping, against which he offers no specific counter-argument, is another reason to discount his allegations of disabling pain.  The Court concludes the ALJ's credibility determination should be upheld.

III.  CONCLUSION

The Commissioner's final decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: January 31, 2012                UNITED STATES DISTRICT COURT